Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - N96
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 1 of 17 PAGEID #: 85

**EXHIBIT A**

IN THE COMMON PLEAS COURT OF FRANKLIN COUNTY, OHIO
CIVIL DIVISION

| | |
|---|---|
| ERIC GILBERT<br>5961 NW 2nd Avenue<br>Boca Raton, FL 33487<br><br>On Behalf of Himself and All Others<br>Similarly Situated,<br><br>               Plaintiff,<br><br>    v.<br><br>ABERCROMBIE & FITCH CO.<br>6301 Fitch Path<br>New Albany, Ohio 43054<br><br>ARTHUR C. MARTINEZ<br>22 Porchuck Road<br>Greenwich, CT 06831<br><br>JAMES B. BACHMANN<br>7559 Ehret Round<br>New Albany, OH 43054<br><br>BONNIE R. BROOKS<br>113 Dupont Street, Suite 100<br>Toronto, ON M5R 1V4<br><br>TERRY L. BURMAN<br>40 Brunell Avenue<br>Lenox, MA 01240<br><br>SARAH M. GALLAGHER<br>78 Seaview Avenue<br>New Rochelle, NY 10801<br><br>MICHAEL E. GREENLEES<br>Citypoint<br>1 Ropemaker Street<br>London EC2Y 9AW | CASE NO.<br><br>JUDGE<br><br>**CLASS ACTION COMPLAINT**<br><br>(Jury Demand Endorsed Hereon) |

0C649 - N97
Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 2 of 17 PAGEID #: 86

| |
|---|
| ARCHIE M. GRIFFIN<br>6845 Temperance Point Place<br>Westerville, OH 43082<br><br>CHARLES R. PERRIN<br>676 Titicus Road<br>North Salem, NY 10560<br><br>STEPHANIE M. SHERN<br>11 Greenbriar Road<br>Little Falls, NJ 07424<br><br>CRAIG R. STAPLETON<br>21 Alden Road<br>Greenwich, CT 06831<br><br>WELLS FARGO BANK, N.A.<br>101 North Phillips Avenue<br>Sioux Falls, SD 57104<br><br>Defendants. |

## CLASS ACTION COMPLAINT

Plaintiff Eric Gilbert ("Plaintiff"), by the undersigned attorneys, submits this Class Action Complaint against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this action individually and as a class action on behalf of the stockholders of Abercrombie & Fitch Co. ("Abercrombie" or the "Company") other than defendants and their affiliates (the "Class," as defined herein), seeking to remedy defendants' breaches of fiduciary duties and other violations of law.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - N98
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 3 of 17 PAGEID #: 87

2. In breach of their fiduciary duties as directors of the Company, the Individual Defendants (as defined herein) wrongfully agreed to unlawful provisions in the Company's $300 million term loan credit agreement (the "Term Loan Credit Agreement"), dated as of August 7, 2014, among Abercrombie & Fitch Management Co. ("A&F Management Co."), as borrower, Abercrombie, as parent, the lenders from time to time party thereto (the "Term Lenders"), and Wells Fargo Bank, National Association ("Wells Fargo") as agent for the Term Lenders. The unlawful provisions trigger the Term Lenders' right to accelerate the outstanding debt under the Term Loan Credit Agreement if a majority of the seats of the Company's board of directors (the "Board") become occupied by persons who were neither (i) nominated by the members of the incumbent Board nor (ii) appointed by directors so nominated (the "Dead Hand Proxy Put").

3. The Term Loan Credit Agreement does not provide the Board an "approval" right that would allow it to disarm the Dead Hand Proxy Put by "blessing" the nomination of – even without endorsing – dissident director nominees. Thus, any successful proxy fight that replaces a majority of the Board would qualify as a change of control under the Term Loan Credit Agreement and could trigger potentially catastrophic debt acceleration. As of May 2, 2015, the gross amount outstanding under the Term Loan Credit Agreement was $298.5 million.

4. Also on August 7, 2014, the Individual Defendants entered into a revolving credit agreement (the "Revolving Credit Agreement" and together with the Term Loan Credit Agreement, the "Credit Agreements"), among A&F Management Co., as the lead borrower, the lenders from time to time party thereto (the "Revolver Lenders"), Wells Fargo, as administrative agent for the Revolver Lenders, and certain other parties thereto. The Revolving Credit Agreement contains the same unlawful debt acceleration provisions as the Term Loan Credit Agreement.

-3-

5. Additionally, under both of the Credit Agreements, the acquisition of 33% or more of Abercrombie stock by any person or group triggers an event of default that accelerates the debt and makes it immediately due and payable (the "Poison Put").

6. The unlawful deterrent effect of the Dead Hand Proxy Put and the Poison Put in the Credit Agreements is twofold. First, potential activists will be deterred from seeking seats on the Board because the debt acceleration provisions will have a coercive effect on stockholders to vote in favor of the incumbent directors. Second, potential acquirers seeking to initiate a takeover may be prevented from doing so because the Board has unlawfully ceded to the Company's lenders the authority to approve or reject a takeover. Not coincidentally, these provisions were entered into just months after Abercrombie was embroiled in a highly-publicized and contentious proxy fight with activist hedge fund investor Engaged Capital.

7. In *San Antonio Fire & Police Pension Fund v. Amylin Pharmaceuticals., Inc.*, 983 A.2d 304, 307 (Del. Ch. 2009) ("*Amylin*"), the Delaware Court of Chancery recognized that proxy put provisions like the ones in the Credit Agreements "can operate as improper entrenchment devices that coerce stockholders into voting only for persons approved by the incumbent board."[1] In *Pontiac General Employees Retirement System v. Healthways, Inc.*, C.A. No. 9789-VCL (Transcript) ("*Healthways*"), in a ruling on a motion to dismiss, the Delaware Court of Chancery held that such provisions "have a chilling effect on, among other things, potential proxy contests such that stockholders would be deterred, they would have the Sword of Damocles hanging over them, when they were deciding what to do with respect to a proxy contest."

---

[1] In light of the Company's incorporation in Delaware, the Board's fiduciary duties are governed by Delaware law.

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - O1
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 5 of 17 PAGEID #: 89

8.  Accordingly, through this action, Plaintiff seeks to invalidate the Dead Hand Proxy Put and Poison Put provisions in the Credit Agreements.

## JURISDICTION AND VENUE

9.  This Court has jurisdiction over this action. This action is a class action and the gravamen of this case relates to the liability of the directors of Abercrombie.

10. Venue is proper in this county pursuant to Ohio Civ. R. 3(B)(2), as defendant Abercrombie maintains its principal place of business in Franklin County.

## PARTIES

11. Plaintiff is a shareholder of Abercrombie, was a shareholder of Abercrombie at the time of the wrongdoing alleged herein, and has been a shareholder of Abercrombie continuously since that time.

12. Defendant Abercrombie is a Delaware corporation with its principal place of business located at 6301 Fitch Path, New Albany, Ohio 43054.

13. Defendant Arthur C. Martinez ("Martinez") has served as Chairman of the Board since January 27, 2014, and currently serves as the Executive Chairman of the Board, a position he has held since December 8, 2014. He is also a member of the Office of the Chairman of the Company and serves as Chair of the Executive Committee.

14. Defendant James B. Bachmann ("Bachmann") has served as a director of the Company since 2003.

15. Defendant Bonnie R. Brooks ("Brooks") has served as a director of the Company since 2014.

16. Defendant Terry L. Burman ("Burman") has served as a director of the Company since 2014.

-5-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - O2
Case: 2:15-cv-02894-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 6 of 17 PAGEID #: 90

17. Defendant Sarah M. Gallagher ("Gallagher") has served as a director of the Company since 2014.

18. Defendant Michael E. Greenlees ("Greenlees") has served as a director of the Company since 2011.

19. Defendant Archie M. Griffin ("Griffin") has served as a director of the Company since 2000.

20. Defendant Charles R. Perrin ("Perrin") has served as a director of the Company since 2014.

21. Defendant Stephanie M. Shern ("Shern") has served as a director of the Company since 2014.

22. Defendant Craig R. Stapleton ("Stapleton") has served as a director of the Company since 2009.

23. Defendants Martinez, Bachmann, Brooks, Burman, Gallagher, Greenlees, Griffin, Perrin, Shern and Stapleton are collectively referred to hereinafter as the "Individual Defendants" or the "Board."

24. Defendant Wells Fargo is the primary U.S. operating subsidiary of Wells Fargo & Company, with its principal executive offices located at 101 North Phillips Avenue, Sioux Falls, South Dakota 57104, and is the administrative agent for the lenders in the Agreements discussed herein.

## SUBSTANTIVE ALLEGATIONS

### The Dead Hand Proxy Put

25. Citing the "failed leadership of a Board that has lacked the independence necessary to properly act as … fiduciaries", activist hedge fund Engaged Capital initiated a

0C649 - O3
Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 9 of 17 PAGEID #: 91

proxy fight with the Company in February 2014 by nominating five dissident candidates for directorship on the Company's Board. In April 2014, Abercrombie settled the proxy fight with Engaged Capital, agreeing to add four new directors to its Board.

26.     Less than four months after the settlement with Engaged Capital, the Abercrombie Board entered into the Credit Agreements containing the Dead Hand Proxy Puts and Poison Puts. The adoption of these provisions was an attempt by the Board to ward off further activists from potentially initiating a proxy contest, rather than a significant concession to the lenders used to obtain more favorable lending terms for the Company.

27.     On August 7, 2014, the Company entered into the Term Loan Credit Agreement pursuant to which the Term Lenders made an unsecured term loan (the "Term Loan") to Abercrombie in the principal amount of $300 million. A portion of the proceeds from the Term Loan were used to (a) repay the outstanding balance of approximately $127.5 million under the Company's 2012 term loan agreement, (b) repay outstanding borrowings of approximately $60 million under the Company's 2011 credit agreement and (c) pay fees and expenses incurred in connection with the Term Loan Credit Agreement.

28.     The Term Loan Credit Agreement will mature on August 7, 2021 and amortizes at a rate equal to 0.25% of the original principal amount per quarter, beginning with the fourth quarter of fiscal year 2014. The gross amount outstanding under the Term Loan Credit Agreement was $298.5 million as of May 2, 2015.[2]

29.     Abercrombie entered into the Revolving Credit Agreement on August 7, 2014. The Revolving Credit Agreement provides that at any time during the five-year term of the

---

[2] As of May 2, 2015, the Company had approximately $620 million in total outstanding long-term indebtedness, and the acceleration of debt under the Credit Agreements could cause a cross-default on the Company's other outstanding indebtedness and result in even greater financial harm to Abercrombie.

-7-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 08/24/15 Page: 8 of 17 PAGEID #: 92

agreement, Abercrombie may borrow up to $400 million on a revolving credit basis (the "Revolver"). The Revolver also has an accordion feature that allows the Company to increase the revolving commitment by up to $100 million. All outstanding amounts under the Revolver are due and payable on August 7, 2019.

30. Both Credit Agreements contain identical "Change of Control" provisions regarding the composition of the Board. Specifically, under Section 1.01 of the Credit Agreements, a "Change of Control" is defined as, among other things, the:

> occupation of a majority of the seats (other than vacant seats) on the board of directors of the Parent by Persons who were neither (i) nominated by the board of directors of the Parent nor (ii) appointed by directors so nominated.

31. Section 8.01(j) of the Credit Agreements provide that a "Change of Control" constitutes an "Event of Default." Section 8.02 of the Credit Agreements provide that upon an Event of Default, the Administrative Agent may, or at the request of the Required Lenders shall, take the following action:[3]

> declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations (other than Other Liabilities) to be ***immediately due and payable***, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties.
>
> (Emphasis added).

### Proxy Puts Are Unlawful Absent Exceptional Circumstances Not Present Here

32. As the Delaware Chancery Court articulated in *Amylin*, a proxy put provision in a corporation's credit agreement (even one without a "dead hand" feature) can unfairly coerce

---

[3] The language quoted above from Section 8.02 comes from the Revolving Credit Agreement. Section 8.02 of the Term Loan Credit Agreement adds the word "Term" before Loans, and also omits the phrase "other than Other Liabilities," but is otherwise identical.

-8-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - O5
Case: 2:15-cv-02894-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 9 of 17 PAGEID #: 93

stockholders to vote in favor of incumbent directors because the effect of replacing a majority of the board would be devastating to the company:

> This case does highlight the troubling reality that corporations and their counsel routinely negotiate contract terms that may, in some circumstances, impinge on the free exercise of the stockholder franchise. In the context of the negotiation of a debt instrument, this is particularly troubling, for two reasons. First, as a matter of course, there are few events which have the potential to be more catastrophic for a corporation than the triggering of an event of default under one of its debt agreements. Second, the board, when negotiating with rights that belong first and foremost to the stockholders (*i.e.*, the stockholder franchise), must be especially solicitous to its duties both to the corporation and to its stockholders. This is never more true than when negotiating with debtholders, whose interests at times may be directly adverse to those of the stockholders.

*Amylin*, 983 A.2d at 319. Thus, the court in *Amylin* warned that:

> A provision in an indenture with such an eviscerating effect on the stockholder franchise would raise grave concerns. In the first instance, those concerns would relate to the exercise of the board's fiduciary duties in agreeing to such a provision…. Additionally, the court would have to closely consider the degree to which such a provision might be unenforceable as against public policy.

*Id.* at 315.

33. In 2013, Leo Strine, then Chancellor of the Delaware Chancery Court (now Chief Justice of the Delaware Supreme Court), granted injunctive relief to a stockholder plaintiff in *Kallick* v. *SandRidge Energy, Inc.*, 68 A.3d 242, 247 (Del. Ch. 2013) after concluding that the board of directors of SandRidge "failed to exercise its discretion in a reasonable manner" when it used the threat of a proxy put to sway shareholders against supporting an alternative slate of directors proposed by the hedge fund TPG-Axon.

34. On October 14, 2014, in *Healthways* the Delaware Chancery Court declined to dismiss fiduciary duty claims against the directors of Healthways and an aiding and abetting

-9-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 10 of 17 PAGEID #: 94

claim against its lender administrative agent, SunTrust Bank, for entering into an agreement containing a proxy put provision, holding that "because the proxy put exists, it necessarily has an effect on people's decision-making about whether to run a proxy contest and how to negotiate with respect to potential board representation," and that the existence of a proxy put "would have a chilling effect on, among other things, potential proxy contests such that the stockholders would be deterred, they would have the Sword of Damocles hanging over them, when they were deciding what to do with respect to a proxy contest."

35. The court in *Amylin* held that for a proxy put provision to be lawful, "[t]he court would want, at a minimum, to see evidence that the board believed in good faith that, in accepting such a provision, it was obtaining in return extraordinarily valuable economic benefits for the corporation that would not otherwise be available to it." 983 A.2d at 315.

36. The Individual Defendants cannot possibly make the showing required by *Amylin* because they did not obtain "extraordinarily valuable economic benefits for the corporation that would not otherwise be available to it" and could not in good faith believe that they had done so. *Id.*. On the contrary, the circumstances under which the Board entered into the Agreements, as well as the Company's own disclosures, demonstrate that there was nothing "extraordinary" about the Agreements.

37. The Company's Form 8-K filed on August 7, 2014 explicitly states that "[t]he [Credit Agreements] include **customary** events of default including non-payment of principal, interest or fees, violation of covenants, inaccuracy of representations or warranties, cross-default to other material indebtedness, bankruptcy and insolvency events, invalidity or impairment of guarantees or security interests, material judgments and **change of control**." (Emphasis added).

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - O7
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 11 of 17 PAGEID #: 95

38. In addition, in connection with the Company's entry into the Credit Agreements, the Company terminated (a) its term loan credit agreement, dated February 24, 2012 (the "2012 Term Loan Credit Agreement") and most recently amended on November 4, 2013, among Abercrombie and certain of its subsidiaries, the financial institutions named therein as lenders, and PNC Bank, National Association, as administrative agent; and (b) the amended and restated credit agreement, dated July 28, 2011 and most recently amended on November 4, 2013, among Abercrombie and certain of its subsidiaries, the financial institutions named therein as lenders, and PNC Bank, National Association, as global agent.

39. Therefore, by entering into the Credit Agreements, the Company was ending prior agreements that, had significant time remaining before their maturity, particularly the 2012 Term Loan Credit Agreement, which had more than 30 months left before it was set to mature. The Board therefore did not obtain "extraordinarily valuable economic benefits" in exchange for agreeing to the Dead Hand Proxy Puts. Rather, the Board obtained financing terms generally available to the Company in the marketplace.

### The Poison Put

40. In addition to the Dead Hand Proxy Put, the Credit Agreements also contain a Poison Put provision triggered by any stockholder or group of stockholders acquiring 33% voting power. Specifically, the definition of "Change of Control" in the Credit Agreements includes:

> ***the acquisition of ownership, directly or indirectly***, beneficially or of record, on or after the Closing Date, by ***any Person or group*** (within the meaning of the Securities Exchange Act of 1934 and the rules of the SEC thereunder as in effect on the date hereof but in all cases other than the Parent or any Subsidiary of the Parent, in each case including, without limitation, in its fiduciary capacity, or any employee benefit plan of the Parent or any Subsidiary of the Parent, or any entity or trustee holding Equity Interests for or

-11-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007854
0C649 - O8
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 12 of 17 PAGEID #: 96

pursuant to the terms of any such plan or for the purpose of funding any such plan or funding other employee benefits for employees of the Parent or any Subsidiary of the Parent), *of Equity Interests representing more than 33% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of the Parent as of the date of such acquisition*. (Emphasis added).

41. As explained above, pursuant to Section 8.01(j) of the Credit Agreements, a "Change of Control" constitutes an "Event of Default," and Section 8.02 of the Credit Agreements provides that the lenders and administrative agent can accelerate outstanding indebtedness upon an Event of Default.

42. Thus, as a result of the Poison Put, the Company cannot be taken over without triggering a Default, and thus immediate acceleration of all outstanding principal and interest under the Credit Agreements.

43. Section 10.01 of the Credit Agreements provides that "[n]o amendment or waiver of any provision of this Agreement or any other Loan Document, and no Consent to any departure by any Loan Party therefrom, shall be *effective unless in writing signed by the [Administrative] Agent*, with the Consent of the Required Lenders, and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Agent, and each such waiver or Consent shall be effective only in the specific instance and for the specific purpose for which given." (Emphasis added). Thus, the Company (and the Board) cannot eliminate the Dead Hand Proxy Put or the Poison Put without the consent of Wells Fargo and the "Required Lenders".

### Poison Puts Are Unlawful

44. In *Paramount Communications, Inc. v. QVC Network Inc.*, 637 A.2d 34, 51 (Del. 1994), the Delaware Supreme Court held that "[t]o the extent that a contract, or a provision

-12-

0C649 - O9
Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 13 of 17 PAGEID #: 97

thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable."

45. As a result of the Poison Put provision, the Board cannot agree to sell the Company to any potential acquirer at any price without either obtaining the consent of Wells Fargo and the lender group or risking a catastrophic acceleration of millions of dollars of debt. As of May 2, 2015, the Company had cash and cash equivalents of $383.2 million, and gross borrowings of $298.5 million outstanding under the Term Loan. Therefore, an acceleration of this debt would deplete nearly 78% of the Company's available cash.

46. By contracting away its ability to entertain value-maximizing offers to acquire the Company, the Board has breached its fiduciary duties to Plaintiff and the Class

## CLASS ACTION ALLEGATIONS

47. Plaintiff brings this action on his own behalf and as a class action on behalf of all stockholders of Abercrombie except the Individual Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any Individual Defendant (the "Class").

48. This action is properly maintainable as a class action.

49. The Class is so numerous that joinder of all members is impracticable. As of June 4, 2015, there were approximately 69,568,798 shares of Company stock outstanding. Upon information and belief, there are thousands of members of the Class.

50. There are questions of law and fact which are common to the Class, including, but not limited to:

    a.    whether the Individual Defendants breached their fiduciary duties by approving and entering into the Credit Agreements containing the Dead Hand Proxy Puts and Poison Puts;

    b.    whether Wells Fargo aided and abetted the Individual Defendants' breaches of fiduciary duties; and

-13-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - O10
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 14 of 17 PAGEID #: 98

   c. whether the Dead Hand Proxy Puts and Poison Puts should be invalidated.

  51. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

  52. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual Class members that would establish incompatible standards of conduct for the Individual Defendants.

  53. The Individual Defendants have acted or refused to act on grounds that apply generally to the Class, such that final injunctive relief and/or corresponding declaratory relief is appropriate respecting the Class as a whole.

  54. The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

  55. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

  56. As directors of Abercrombie, the Individual Defendants owe the Company and its stockholders the fiduciary duties of care, loyalty and good faith. In light of the Company's incorporation in Delaware, these fiduciary duties are governed by Delaware law.

-14-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007854
0C649 - O11
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 15 of 17 PAGEID #: 99

57. As alleged in detail herein, the Individual Defendants breached their fiduciary duties to Plaintiff and the Class by agreeing to the Dead Hand Proxy Puts and Poison Puts in the Credit Agreements.

58. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, Plaintiff and the Class have had their voting rights, and their rights to consider potential premium offers to acquire the Company, improperly impaired.

59. Plaintiff and the Class have no adequate remedy at law.

## COUNT II

### Against Wells Fargo for Aiding and Abetting the Individual Defendants' Breach of Fiduciary Duty

60. Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

61. Wells Fargo knew or had reason to know that the Board's agreeing to the Dead Hand Proxy Puts and Poison Puts in the Credit Agreements was a breach of the Individual Defendants' fiduciary duties, yet Wells Fargo nonetheless included those provisions and encouraged the Board to approve them.

62. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, aided and abetted by Wells Fargo, Plaintiff and the Class have had their voting rights, and their rights to consider potential premium offers to acquire the Company, improperly impaired.

63. Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

  A. Declaring that the Individual Defendants breached their fiduciary duties by approving the Credit Agreements that contained the Dead Hand Proxy Puts and Poison Puts;

0C649 - O12
Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 16 of 17 PAGEID #: 100

B. Declaring that Wells Fargo aided and abetted the Individual Defendants' breaches of fiduciary duty in approving the Dead Hand Proxy Puts and Poison Puts;

C. Declaring the Dead Hand Proxy Puts and Poison Puts invalid, unenforceable, and severable;

D. Enjoining Defendants from enforcing the Dead Hand Proxy Puts and Poison Puts;

E. Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accounts' and experts' fees, costs and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Maribeth Meluch
Maribeth Meluch (0055903)
mmeluch@isaacwiles.com
Isaac Wiles Burkholder & Teetor, LLC
Two Miranova Place, Ste 700
Columbus, Ohio 43215
p. 614-221-2121
f. 614-365-9516
Attorneys for Plaintiff

Of Counsel:

KESSLER TOPAZ
  MELTZER & CHECK, LLP
Eric L. Zagar
280 King of Prussia Road
Radnor, PA 19087
Phone: (610) 667-7706
Facsimile: (610) 667-7056
ezagar@ktmc.com

FRIEDMAN OSTER PLLC
Jeremy Friedman
Spencer Oster

-16-

Franklin County Ohio Clerk of Courts of the Common Pleas- 2015 Aug 22 9:38 AM-15CV007354
0C649 - O13
Case: 2:15-cv-02854-GCS-KAJ Doc #: 2 Filed: 09/24/15 Page: 17 of 17 PAGEID #: 101

240 E. 79th Street, Suite A
New York, NY 10075
Phone: (888) 529-1108
jfriedman@friedmanoster.com
soster@friedmanoster.com

*Attorneys for Plaintiff*

## JURY DEMAND

Pursuant to Rule 38 of the Ohio Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

/s/ Maribeth Meluch
Maribeth Meluch (0055903)

3151238.1 : 03552 00003

-17-