IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


ERIC GILBERT, on behalf of himself
and all others similarly situated,

        Plaintiffs,

                            Case No. 2:15-cv-2854
                            Judge Smith
v.                           Magistrate Judge King

ABERCROMBIE & FITCH, CO.,
*et al.*,

        Defendants.


<u>REPORT AND RECOMMENDATION</u>

    This matter is before the Court, pursuant to an order of reference, *see Preliminary Approval Order*, ECF No. 19, p. 2, on *Plaintiff's Motion for Final Approval of Class Action Settlement and Application for an Award of Attorneys' Fees and Reimbursement of Expenses*, ECF No. 22 ("*Plaintiff's Motion for Final Approval*").  The Court conducted a fairness hearing on June 28, 2016.  *Order*, ECF No. 26.

I.    **Background**

    Plaintiffs initiated this stockholder class action in the Court of Common Pleas for Franklin County, Ohio, on August 22, 2015, against defendants Abercrombie & Fitch Co. ("ANF" or "the Company"), Wells Fargo Bank, N.A. ("Wells Fargo"), and Arthur C. Martinez, James B. Bachmann, Bonnie R. Brooks, Terry L. Burman, Sarah M. Gallagher, Michael E. Greenlees, Archie M. Griffin, Charles R. Perrin, Stephanie M. Shern, and Craig R. Stapleton (together, the "Individual

Defendants"). Defendants removed the action to this Court on September 24, 2015, pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453. ECF No. 1. Plaintiff Gilbert is an ANF shareholder who resides in Florida. *Complaint*, ECF No. 2, page 1 (caption); ¶ 11. ANF is a citizen of Delaware and Ohio. *Id*. at ¶ 12. Wells Fargo is a citizen of South Dakota. *Id*. at ¶ 16. None of the Individual Defendants is a citizen of Florida. *Id*. at 1 (caption).

**A.  Alleged Wrongdoing**

The Individual Defendants entered into two credit agreements on August 7, 2014, with Wells Fargo serving as administrative agent:  (1) a term loan credit agreement that provides an unsecured term loan to ANF in the principal amount of $300 million, maturing on August 7, 2021 ("Term Loan Credit Agreement"); and (2) a revolving credit agreement that provides up to $400 million on a revolving basis, maturing on August 7, 2019 (the "Revolving Credit Agreement") (collectively with the Term Loan Credit Agreement, "the Credit Agreements"). *Complaint*, ¶¶ 2, 26-28; *Stipulation and Agreement of Settlement*, ECF No. 23-1, § I.2. Under Section 8.01(j) of the Credit Agreements, a "Change of Control" constitutes an "Event of Default." *Complaint*, ¶ 31. Section 8.02 of the Credit Agreements provides that upon an "Event of Default," the "Administrative Agent" may, or at the request of the "Required Lenders" shall, "declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other Obligations . . . to be ***immediately due and payable***, without presentment, demand, protest or other notice of any kind[.]" *Id*. (emphasis added by *Complaint*).

2

Under Section 1.01 of the Credit Agreements, the definition of "Change of Control" contained a provision whereby a change of control would be triggered by, *inter alia*, "the occupation of a majority of the seats (other than vacant seats) on the board of directors of the Parent by Persons who were neither (i) nominated by the board of directors nor (ii) appointed by directors so nominated [the "Dead Hand Proxy Put"]." *Complaint*, ¶ 30.

Under the Credit Agreements, the board of directors ("the Board") does not have an approval right that would permit it to disarm the Dead Hand Proxy Put provisions by approving—-even if not endorsing-- the dissident director nominees. *Id.* at ¶ 3. Under these circumstances, a successful proxy fight that replaced a majority of the Board would qualify as a change of control under the Credit Agreements and trigger debt acceleration. *Id.* at ¶¶ 3-4. As of May 2, 2015, the gross amount outstanding under the Term Loan Credit Agreement was $298.5 million. *Id.* at ¶ 3.

Both Credit Agreements also contain another debt acceleration provision. *Id.* at ¶¶ 5, 40. More specifically, the definition of "Change of Control" includes, *inter alia*, the acquisition of 33% or more of ANF stock by any person or group, which then triggers an event of default that accelerates the debt and makes it immediately due and payable (the "Poison Put"). *Id.* at ¶¶ 5, 40-43.

The *Complaint* identifies the deterrent effect of these debt acceleration provisions as two-fold. *Id.* at ¶ 6. First, such provisions deter potential activists from seeking seats on the Board because such provisions coerce stockholders to vote in favor of the

incumbent directors in order to avoid accelerating ANF's approximately $300 million in debt. *Id.* Second, the Poison Put provisions also may prevent potential acquirers from seeking to initiate a takeover because the Board has unlawfully ceded to ANF's lenders the authority to approve or reject a takeover. *Id.*

Plaintiffs filed the instant action on August 22, 2015, asserting claims of breach of fiduciary duty as against the Individual Defendants (Count I) and aiding and abetting the Individual Defendants' breach of fiduciary duty as against Wells Fargo (Count II). *Id.* at ¶¶ 55-63. The *Complaint* seeks declaratory and injunctive relief, including enjoining defendants from enforcing the Dead Hand Proxy Puts and Poison Puts, as well as an award of costs and attorneys' fees.

**B.    Negotiations and Preliminary Approval**

Within weeks of the filing of this action, ANF agreed to revise the Credit Agreements to eliminate the threats posed by the Dead Hand Proxy Put provisions ("the Amendments"). *Declaration of Robin Winchester*, ECF No. 23, ¶ 13 ("*First Winchester Declaration*"); *Stipulation and Agreement of Settlement*, § II.6, § III.B.17. More specifically, ANF modified the Revolving Credit Agreement by removing from the definition of "Change of Control" the Dead Hand Proxy Put provisions. *See Id.*; ANF's Current Report (Form 8-K dated September 10, 2015), ECF No. 23-13, PAGEID#1318. Similarly, ANF amended the Term Loan Credit Agreement by amending the definition of "Change of Control" so that it does not treat changes in the composition of the Board differently in the context of actual or threatened proxy

solicitations.  *Id.* at PAGEID#:1318-1319.  The Amendments became effective September 10, 2015.  *Id.; Stipulation and Agreement of Settlement*, § II.6.

In light of the Amendments, counsel for the parties began arm's-length negotiations regarding possibly settling the action on a class-wide basis.  *First Winchester Declaration*, ¶ 14.  Approximately five months later, on or around February 18, 2016, counsel for the parties concluded their settlement discussions and finalized the documentation of their agreement.  *Id.* at ¶ 15.  On March 16, 2016, *Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement*, ECF No. 18, was filed.  On March 24, 2016, the Court preliminarily approved the proposed settlement, preliminarily certified a class for settlement purposes, appointed the named plaintiff as Class Representative, appointed lead counsel for the class, approved and directed the issuance of notice to the class, and referred the matter to the undersigned for a fairness hearing

> to, among other things:  (i) determine whether the proposed Settlement, on the terms and conditions provided for in the Stipulation, should be approved by the Court;  (ii) determine whether the Released Claims against Defendants should be dismissed with prejudice as set forth in the Stipulation; (iii) determine whether Plaintiff's Counsel's application for an award of Attorneys' Fees and Expenses should be approved; and (iv) rule on such other matters as the Court may deem appropriate.

*Preliminary Approval Order*, ECF No. 19, pp. 2-3.  The Court also established a procedure for the filing of written objections to the proposed settlement.  *Id.* at 4-5.

The undersigned held a fairness hearing, conducted pursuant to Fed. R. Civ. P. 23(e), on June 28, 2016. Only counsel for the parties appeared.

This matter is now ripe for consideration.

### C. Preliminarily Certified Class

The preliminarily certified Class of plaintiffs consists of the following:

> [A]ll persons who held ANF common stock at any time during the period from August 7, 2014 through and including the close of trading on the date of the Settlement Hearing[1] [hearing at which the parties will present the *Stipulation and Agreement of Settlement* for approval by the Court] ("the Class Period") and who continued to hold ANF common stock as of the end of the Class Period, but excluding (i) the Individual Defendants and their respective immediate family members; and (ii) agents, attorneys, heirs, successors-in-interest or assigns of any of the foregoing excluded persons.

*Stipulation and Agreement of Settlement*, § III.A.16. *See also Preliminary Approval Order*, p. 3. Plaintiff Eric Gilbert has been appointed as Class Representative of the Class. *Id*.

### D. The Proposed *Stipulation and Agreement of Settlement*

The *Stipulation and Agreement of Settlement* memorializes the Amendments to the Credit Agreements effective September 10, 2015. *Id*. at § III.B.17. The proposed settlement also provides for a new procedure, which plaintiff summarizes as follows:

> [T]he ANF Board will adopt a resolution instructing the General Counsel of the Company that, during the designated period, certain proposed agreements that include a Change-of-Control Provision must be presented to the ANF Board, prior to execution and delivery, for review of any impact of said Change-of-Control Provision on the ANF Stockholder voting franchise, among other factors in the Board's

---

[1] Capitalized terms not otherwise defined have the meaning indicated in the *Stipulation and Agreement of Settlement*.

exercise of its business judgment. *See id.* [*Stipulation and Agreement of Settlement*] at § III.B.18. This new procedure requires Board-level consideration before the Company can enter into any defined Agreements with provisions similar to the Dead Hand Proxy Puts at issue which could impinge on ANF's stockholders' voting rights.

*Plaintiff's Motion for Final Approval*, p. 6 (citing *Stipulation and Agreement of Settlement*). The *Stipulation and Agreement of Settlement* releases all claims by the Class Plaintiff, ANF, each of ANF's stockholders, and defendants. *Stipulation and Agreement of Settlement*, § III.B.19-20. The proposed settlement further provides that ANF will pay up to $165,000.00 for plaintiff's attorneys' fees and expenses plus reimbursement of expenses not to exceed $2,000.00, and will take no position on plaintiff's application for such fees and expenses. *Id.* at § III.D.21. The proposed settlement contemplates that the Court "may consider and rule upon fairness, reasonableness and adequacy of the Settlement independently of any award of Attorneys' Fees and Expenses." *Id.* Class Plaintiff's Counsel "shall allocate the attorneys' fees awarded amongst Class Plaintiff's Counsel in a manner which they, in good faith, believe reflects the contributions of such counsel." *Id.* at § III.D.22. The proposed settlement does not contemplate any other monetary payment, either to ANF or to its stockholders.

### E. Notice to ANF Stockholders

In accordance with the *Preliminary Approval Order*, ECF No. 19, ANF notified the class of the proposed settlement by: (1) filing a Form 8-K with the Unites States Securities and Exchange Commission ("SEC"); and (2) posting on the "Investors" page of ANF's website, which shall remain throughout the Settlement Effective Date. *First*

7

*Winchester Declaration*, ¶ 18; ANF's Current Report (Form 8-K), ECF No. 23-14.  These forms of notice provided the ANF stockholders with, *inter alia*, a copy of the *Notice of Pendency and Proposed Settlement of Class Action*, ECF No. 18-3 ("the Notice"); the *Stipulation and Agreement of Settlement*; and a copy of the *Preliminary Approval Order*, ECF No. 19.  *First Winchester Declaration*, ¶ 18.  The Notice detailed the proposed settlement, including the request for attorneys' fees and expenses.  *Id*. at ¶ 19.  The Notice also provided the time and place of the fairness hearing and explained the procedures for objecting to the proposed settlement and request for fees.  *Id*.  The Notice advised Class members that the deadline for objecting was June 14, 2016.  *Id*.  ANF also gave notice to the Class consistent with that which is required under the Class Action Fairness Act ("CAFA") by sending formal service of information about the settlement and the action to the Attorney General of the United States and the Attorneys General of the States designated in the statute.  *Id.*; *Declaration of John J. Kulewicz* ("*Kulewicz Declaration*"), ECF No. 20, ¶¶ 2-6.  No class members have objected to the settlement.

Plaintiff moved for final approval of the settlement agreement and for an award of attorneys' fees and expenses on June 7, 2016.  *See Plaintiff's Motion for Final Approval*.  Defendants have not responded to plaintiff's motion.  No appearance was made by or on behalf of any Class member or objector at the fairness hearing.

This matter is now ripe for the Court's consideration.

## II.  Class Certification

### A.  Standard

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). *See also Stout v. J.D. Byrider*, 228 F.3d 709, 716 (6th Cir. 2000).  Rule 23(a) of the Federal Rules of Civil Procedure establishes four prerequisites to class certification:

> **(1)** the class is so numerous that joinder of all members is impracticable;
>
> **(2)** there are questions of law or fact common to the class;
>
> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  "In addition to fulfilling the four prerequisites of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b)." *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)).  Plaintiffs in this action seek class certification under Rule 23(b)(1)(A) and (b)(2).  "The trial court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  This Court will consider each of the Rule 23 requirements for certification.

### B.    Numerosity

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable[.]"  Fed. R. Civ. P. 23(a)(1). Although "there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006) (quoting *In re Am. Med. Sys.*, 75 F.3d at 1079).  The Company publicly traded its common stock on the New York Stock Exchange under the ticker symbol "ANF."  The Company's filings with the SEC on June 9, 2014, reflect 72,779,580 shares of ANF stock outstanding as of May 30, 2014.  *See* ANF's Form 10-Q filed with the SEC on June 9, 2014 at https://www.sec.gov/Archives/edgar/data/1018840/000101884014000042/anf-2014503x10q.htm.  Although plaintiff is not certain of the exact number of class members, the information filed with the SEC reflects that the number of holders of ANF common stock on August 7, 2014 was likely in the thousands geographically dispersed throughout the United States.  *See id*.  Joinder of thousands – or tens of thousands – of class members across multiple states would be impracticable.  The Court concludes that this large number of potential class members satisfies the numerosity requirement.  *See*, *e.g.*, *In re Whirlpool Corp. Front-Loading Washer Products Liab. Litig.*, 722 F.3d 838, 852 (6th Cir. 2013) ("Evidence of these [thousands of] shipments to retailers is sufficient to show numerosity of a class consisting of all Ohio residents who purchased a Duet in Ohio primarily for personal, family or household purposes."); *Adams v. Anheuser-Busch Companies, Inc.*, No. 2:10-CV-826, 2012 WL 1058961, at *4 (S.D. Ohio

Mar. 28, 2012) (finding a class of approximately 60 individuals geographically dispersed throughout the United States sufficient to satisfy the numerosity requirement).

**C.    Commonality**

"Rule 23(a)(2) requires plaintiffs to prove that there are questions of fact or law common to the class . . . ." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012). "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury." *In re Whirlpool Corp.*, 722 F.3d at 852 (citing *Dukes*, 131 S. Ct. at 2551). "Their claims must depend upon a common contention . . . of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "This inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit." *In re Whirlpool Corp.*, 722 F.3d at 852. *See also Davis v. Cintas Corp.*, 717 F.3d 476, 487 (6th Cir. 2013).

"The commonality test is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re Am. Med. Sys.,* 75 F.3d at 1083 (internal quotations omitted). *See also Dukes*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do[.]") (internal quotations and citations omitted; alterations in original); *In re Whirlpool Corp.*, 722 F.3d at 853. "'[T]he mere fact that questions peculiar to each individual member of the class action

11

remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.'" *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (quoting *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir. 1988)).

This case presents common issues of fact sufficient to satisfy the requirements of Rule 23(a)(2).  The *Complaint* alleges that the Individual Defendants acted in breach of their fiduciary duties and that Wells Fargo aided and abetted that breach in connection with the Dead Hand Proxy Put and Poison Put provisions contained in the Credit Agreements.  Whether the Individual Defendants acted in breach of their fiduciary duties by approving and entering into the Credit Agreements containing these provisions is a question of law common to every member of the class.  *See Complaint*, ¶ 50.  Whether Wells Fargo aided and abetted that breach is also a common question of law and fact.  *Id*.  Finally, whether the Dead Hand Proxy Puts and Poison Puts should be invalidated presents a common question of law.  *Id*.  Accordingly, there are issues of law and fact common to all members of the class sufficient to satisfy the requirements of Rule 23(a)(2).

### D.   Typicality

"Rule 23(a)(3) requires proof that plaintiffs' claims are typical of the class members' claims." *Young*, 693 F.3d at 542.  "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *In re Whirlpool Corp.*, 722 F.3d at 852 (quoting *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 399 (6th Cir. 1998)).  "This requirement insures that the representatives' interests

are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Id.* at 852-53 (citing *Sprague*, 133 F.3d at 399).

In the case presently before the Court, Plaintiff, a current ANF shareholder, was an ANF shareholder at the time of the alleged wrongdoing. *Complaint*, ¶ 11. Plaintiff seeks to represent a class of persons who held ANF common stock at any time during the period from August 7, 2014 until the fairness hearing. Under these circumstances, plaintiff's interests are typical of those of the class. More specifically, the underlying facts and legal theories underlying plaintiff's claims, *i.e.*, the inclusion of the Dead Hand Proxy Put and Poison Put in the Credit Agreements as well as the alleged breach of fiduciary duties and the alleged aiding and abetting thereof, underlie the class members' claims. The typicality requirement of Rule 23(a)(3) is therefore satisfied.

### E.   Fairness and Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (quotations omitted). Two considerations underlie the determination of adequacy of representation: "'1) the representative

must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).  "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.*

As described above, the claims of Plaintiff, the Class Representative, are typical of the class, incentivizing him to pursue the class claims.  No objections have been filed with the Court expressing concern that Plaintiff will not vigorously pursue the class claims.  Based on this record, the Court is persuaded that, in pursuing his own interests and claims, Plaintiff will also advocate for the interests of the class members.

In addition, Plaintiff has retained Class Counsel who are experienced practitioners in class action litigation and are qualified to handle this matter.  *See, e.g., First Winchester Declaration*, ¶ 6; *Declaration Mark Landes*, ECF No. 23-3, ¶ 3 ("*First Landes Declaration*"); *Declaration of Jeremy Friedman*, ECF No. 23-4, ¶ 2 ("*First Friedman Declaration*"); Exhibit 5, attached to *First Winchester Declaration* (copy of profiles of firm Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") and its attorneys).  Because the Class Representative and Class Counsel have demonstrated an ability to vigorously pursue the claims of the class, and because there is no conflict of interest or antagonism with Plaintiff or the rest of the

class, the Court concludes that the Class Representative and Class Counsel will fairly and adequately protect the interests of the class.

Plaintiff asks that the law firm of Kessler Topaz be appointed as lead counsel for the class pursuant to Rule 23(g). That rule requires a court to consider several factors:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A).

In the case presently before the Court, Kessler Topaz assisted in reaching a settlement requiring defendants to remove the Dead Hand Proxy Put and Poison Put provisions. *See supra*; *Winchester Declaration*, ¶ 6. Doing so required Kessler Topaz to inspect and analyze the Company's filings with the SEC as well as research the law applicable to such provisions and identify potential defenses. Kessler Topaz has extensive experience in class action litigation in federal and state courts throughout the United States. *See First Winchester Declaration*, ¶ 6; Exhibit 5, attached thereto (copy of Kessler Topaz resume). Kessler Topaz is also skilled in shareholder and transactional litigation, focusing on such a practice over the past 24 years and receiving a Martindale Hubbell "AV" rating. *Id*. Kessler Topaz has extensive available resources, including nearly 100 lawyers specializing in complex stockholder litigation with offices in California and Pennsylvania. *Id*. For all these reasons, then, the

Court concludes that Kessler Topaz will adequately serve as lead counsel.

**F.   Rule 23(b)(1)(A)**

Having concluded that the four prerequisites of Rule 23(a) have been met, the Court must now determine whether Plaintiff has established that this litigation may properly be maintained as a class action under one of the subdivisions of Rule 23(b). Under Rule 23(b)(1)(A) a class action is appropriate where "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class[.]" "A class action is appropriate under this subsection when 'the party is obliged by law to treat the members of the class alike[.]'" *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 633 (6th Cir. 2011) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997)).

The Court finds that certification of a non-opt-out class under Rule 23(b)(1) is appropriate in this action. Plaintiff asserts claims of breach of fiduciary duties and aiding and abetting such breach. These fiduciary duties are owed to all stockholders and a breach of such duties impacts all of the stockholders. Accordingly, if this Court denies class certification, the individual ANF stockholders could file hundreds or thousands of separate actions, risking "inconsistent or varying adjudications" that would "establish incompatible standards of conduct" for defendants. Fed. R. Civ. P. 23(b)(1)(A). For these reasons, certification under Rule 23(b)(1) is

appropriate. *See Shanehchian v. Macy's, Inc.*, No. 1:07-CV-00828, 2011 WL 883659, at *9 (S.D. Ohio Mar. 10, 2011) (certifying class under, *inter alia*, Rule 23(b)(1)(A) where action asserts breach of fiduciary duty claim); *In re Nationwide Fin. Servs. Litig.*, No. 2:08-CV-00249, 2009 WL 8747486, at *11 (S.D. Ohio Aug. 19, 2009) (finding certification under Rule 23(b)(1) appropriate where various shareholder actions could result in inconsistent judgments).

### G.    Rule 23(b)(2)

Plaintiff contends that certification of a non-opt-out class under Rule 23(b)(2) is also appropriate.  This Court agrees. Certification under this sub-section of the rule is proper if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted— the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (internal quotation marks and citations omitted).

The alleged misconduct in the instant case, *i.e.*, the inclusion of the Dead Hand Proxy Put and Poison Put provisions, can be "declared unlawful only as to all of the class members or as to none of them[.]" The removal of such provisions in the Credit Agreements therefore impacts all of the stockholders and protection against the inclusion of comparable provisions in the future likewise benefits all

stockholders.  The Court therefore concludes that certification of a non-opt-out class under Rule 23(b)(2) is also proper.

**III.  Approval of the Proposed Class Settlement**

Rule 23(e) governs settlements of class actions and imposes the following procedural safeguards:

> **(1)** The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> **(2)** If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> **(3)** The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> . . .
>
> **(5)** Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).[2]

The terms of the settlement were previously submitted to the Court, which preliminarily approved those terms. *Preliminary Approval Order*, ECF No. 19.  Notice provided to the class, as described *supra*, was effected in conformity with the directions of the Court.  A fairness hearing was conducted pursuant to Fed. R. Civ. P. 23(e) on June 28, 2016.  The Court must now consider whether the settlement agreement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In making this determination, the Court considers several factors:

---

[2] Rule 23(e)(4), which is not applicable to this case, provides: "If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."

> "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest."

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)). The Court "enjoys wide discretion in assessing the weight and applicability of these factors." *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992). Finally, in considering these factors, the task of the court "is not to decide whether one side is right or even whether one side has the better of these arguments. . . . The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *UAW*, 497 F.3d at 632.

### A.    Risk of Fraud or Collusion

Having carefully examined the terms of the *Stipulation and Agreement of Settlement*, the Court now turns to the first factor of its inquiry, *i.e.*, the risk of fraud or collusion. *See Poplar Creek Dev. Co.*, 636 F.3d at 244. "Courts presume the absence of fraud or collusion unless there is evidence to the contrary." *IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006). This is a complex stockholder class action. The *Stipulation and Agreement of Settlement* is the product of months of protracted, arm's-length, "hard-fought" negotiations between counsel for the parties. *First Winchester Declaration*, ¶¶ 8, 23-24. For example, beginning around September 2015, counsel engaged in repeated discussions and exchanged numerous drafts of proposed settlement terms. *Id*. Throughout these

discussions, the parties requested extensions of time and filed
reports updating the Court on the status of these negotiations, which
culminated in the *Stipulation and Agreement of Settlement*. *Id.  See
also* ECF Nos. 6, 11, 13, 15, 17 (joint motions and status reports).
Despite notice and the opportunity to object, no objections have been
filed.  Based on this record, there is no evidence, or even
suggestion, of fraud or collusion.  This factor therefore weighs in
favor of approval of the *Stipulation and Agreement of Settlement*.

   **B.    Complexity, Expense, and Likely Duration of the Litigation**

   "Generally speaking, '[m]ost class actions are inherently complex
and settlement avoids the costs, delays, and multitude of other
problems associated with them.'"  *In re Telectronics Pacing Sys.,
Inc.*, 137 F. Supp.2d 985, 1013 (S.D. Ohio 2001) *decision clarified,*
148 F. Supp.2d 936 (S.D. Ohio 2001) (quoting *In re Austrian & German
Bank Holocaust Litig.,* 80 F. Supp.2d 164, 174 (S.D.N.Y. 2000)).  This
action is no exception to that general rule.  The action has been
pending for nearly one year and plaintiff has already incurred more
than $100,000.00 in attorneys' fees.  *See*, *e.g.*, *First Winchester
Declaration*, ¶ 47.  In the absence of a settlement, continued
litigation would span years, requiring fact discovery, expert
discovery, formal class certification, and other motion practice,
including post-trial motions and appeals; that litigation would be
both extensive and costly.  *See*, *e.g.*, *id*. at ¶ 30.  Consideration of
this factor therefore weighs in favor of approving the *Stipulation and
Settlement Agreement*.

### C.   Amount of Discovery Engaged in by the Parties

Shortly after this action was filed, the parties began to engage in arm's-length negotiations. *First Winchester Declaration*, ¶¶ 13-14. In light of these negotiations and at the joint request of the parties, ECF No. 11, the preliminary pretrial conference was vacated, *Order*, ECF No. 12, and was never rescheduled in light of the negotiated settlement.  While plaintiff conducted an extensive investigation throughout the development and prosecution of this action, *First Winchester Declaration*, ¶ 25, there was no need to engage in formal discovery because a settlement was reached before the need arose.  This factor is therefore neutral.

### D.   Likelihood of Success on the Merits

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits.  The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *Poplar Creek Dev. Co.*, 636 F.3d at 245 (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984)).

The *Complaint* alleges that the Individual Defendants acted in breach of their fiduciary duties by improperly agreeing to the Dead Hand Proxy Put and Poison Put provisions in the Credit Agreements and that Wells Fargo aided and abetted the Individual Defendants' breach of fiduciary duties. *Complaint*, ¶¶ 32-39, 44-46, 55-63.  Although this Court has not considered the merits of plaintiff's claims, the likelihood of success on such claims, especially that addressing the Poison Put provision, is uncertain.  For example, because ANF is

incorporated in Delaware, *id*. at ¶ 12, Delaware law governs the fiduciary duties of its directors.  *See*, *e.g.*, *In re Abercrombie & Fitch Co. Derivative Litig.*, No. 2:05-CV-00819, 2009 WL 9523196, at *2 (S.D. Ohio Mar. 12, 2009).  Plaintiff faces significant hurdles in proving a breach of fiduciary duty under Delaware law.  Under that law, corporate directors must "use that amount of care which ordinarily careful and prudent men would use in similar circumstances[,]" *Graham v. Allis-Chalmers Mfg. Co*., 188 A.2d 125, 130 (Del. 1963), and "consider all material information reasonably available" in making business decisions, *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000).  Alleged deficiencies in the performance of directors' duties are actionable only if their actions are grossly negligent.  *Id*.  In order to establish a breach, a plaintiff pursuing such a claim must establish that a decision of the board resulted in loss because that decision was ill advised or grossly negligent or that a board's failure to act resulted in loss because due attention would have prevented the loss.  *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del.Ch. 1996).  This is no easy task.  *See id*. ("The theory here advanced is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.").

Under these circumstances, it cannot be said that the likelihood of success on the merits of Plaintiff's claims is certain.  This factor therefore weighs in favor of approval of the *Settlement Agreement*.

**E.   Opinions of Class Counsel and Class Representatives**

Experienced counsel on both sides of this case recommend that the Court approve the *Settlement Agreement* and this recommendation is entitled to deference.  *See e.g.*, *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs[,]" and that deference "should correspond to the amount of discovery completed and the character of the evidence uncovered."). Here, Class Counsel have extensive experience in class actions as well as shareholder class and derivative actions.  *See First Winchester Declaration*, ¶ 6; Exhibit 5, attached thereto (copy of Kessler Topaz resume); *Second Landes Declaration*, ¶ 3; *First Friedman Declaration*, ¶ 2.  With nearly 100 attorneys specializing in complex stockholder litigation, Kessler Topaz, Lead Class Counsel, is particularly experienced in stockholder and transactional litigation.  *First Winchester Declaration*, ¶ 6.  With the breadth of this experience, Class Counsel understand the legal standards and defenses involved in this action and understand what is in the best interests of the Class. *Id*. at ¶ 24.  Equipped with this experience and understanding, Class Counsel have concluded that the proposed settlement is fair, reasonable, and adequate based on the defenses and risks involved in proving liability and damages as well as the further risk, delay, and expense associated with continued litigation.  *See First Winchester Declaration*, ¶¶ 8-9, 24-27.  Counsel for defendants negotiated the *Stipulation and Settlement Agreement*, which reflects defendants' conclusion that "it is desirable that the *Gilbert* Action be fully and

23

finally settled in the manner and conditions set forth in this Stipulation[.]" *Stipulation and Settlement Agreement*, ¶¶ 13-14.  *Cf. First Winchester Declaration*, ¶ 7.  Additionally, counsel for ANF represented at the fairness hearing that the proposed settlement was in the parties' best interest.  *See also Stipulation and Settlement Agreement*, ¶ 12 (". . . ANF believes it to be in the best interests of the Company and its Stockholders for the *Gilbert* Action to be settled and dismissed with prejudice[.]").  Notably, the Class Representative also has approved the *Stipulation and Settlement Agreement. Id*. at ¶¶ 10-11.  Consideration of this factor therefore weighs in favor of approving the *Stipulation and Settlement Agreement*.

    **F.**    **Reaction of Shareholders**

In determining whether a settlement is fair, adequate and reasonable, a court must also consider the reaction of absent shareholders.  *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013).  Notice of the settlement and of the June 28, 2016 fairness hearing was sent to all persons and entities who held shares of ANF common stock as of the close of business on August 29, 2014. *Affidavit of Mailing*, ¶ 2.  As discussed in more detail above, ANF notified the class of the proposed settlement, fairness hearing, and timeline for raising objections in several ways, including by:  filing a Form 8-K with the SEC; posting notice on the "Investors" page of ANF's website; and by formal service of information about the settlement and the action to the Attorney General of the United States and the Attorneys General of the States designated in the statute, consistent with CAFA.  *First Winchester Declaration*, ¶ 18; ANF's

Current Report (Form 8-K), ECF No. 23-14; *Kulewicz Declaration*, ¶¶ 2-6.  No objections were filed and no shareholders appeared at the fairness hearing, which gives rise to an inference that most of the shareholders had no qualms with the proposed settlement.  *Cf. Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (finding that 79 objections in a class of nearly 11,000 members "tends to support a finding that the settlement is fair").  *See also In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 500 (E.D. Mich. 2008) ("If only a small number [of opt outs or objections] are received, that fact can be viewed as indicative of the adequacy of the settlement.") (internal quotations omitted; alteration in original); *Hainey v. Parrott,* 617 F.Supp. 2d 668, 675 (S.D. Ohio 2007) ("Generally, however, a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable and adequate.").  This Court therefore concludes that the lack of any objections supports a finding that the proposed settlement is fair, reasonable, and adequate.

> **G.  Public Interest**

The public interest also favors approval of the proposed settlement.  First, "there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources."  *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (quoting *Granada Invs., Inc.*, 962 F.2d at 1205).  *Accord In re Nationwide Fin. Servs. Litig.*, No. 2:08-cv-00249, 2009 WL 8747486, at *8 (S.D. Ohio Aug. 19, 2009) ("[T]here is

certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve."). Second, the proposed settlement ends potentially long and protracted litigation and frees up judicial resources. *See In re Telectronics*, 137 F.Supp. 2d at 1025. Accordingly, the Court concludes that the proposed settlement serves the public interest.

In short, and considering all the relevant factors, this Court concludes that the proposed settlement provides a substantial benefit to the parties and is fair, reasonable, and adequate.

## IV. Attorneys' Fees and Costs

The *Stipulation and Settlement Agreement* provides that Class Counsel shall submit an application for attorneys' fees, to be awarded by the Court, not to exceed $165,000, plus reimbursement of actual, reasonable, and ordinary expenses not to exceed $2000. *Stipulation and Settlement Agreement*, ¶ 21. The attorneys' fees and expenses shall be paid by ANF (or any applicable insurer). *Id.* Plaintiff included a request for an award of attorneys' fees and expenses in *Plaintiff's Motion for Final Approval* and supplemented that request in *Plaintiff's Supplemental Submission in Further Support of Motion for Final Approval of Class Action Settlement and Application for an Award of Attorneys' Fees and Reimbursement of Expenses*, ECF No. 27. Defendants take no position on Plaintiff's fee application. *Id.*

Plaintiff's successful prosecution of this action justifies an award of reasonable attorneys' fees. *See Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194 (6th Cir. 1974) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970)); *Shlensky*, 574 F.2d at

149.  Plaintiff proposes that an award based on the lodestar method of calculation is appropriate, and this Court agrees with that proposition.  Notably, the proposed settlement does not provide for a common fund and, as discussed *supra*, the exact value of the resulting benefit to ANF and to its shareholders cannot be precisely determined.  The lodestar method will account for the amount of work performed by counsel and will ensure that counsel is fairly compensated for the results achieved.  *See Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).

In determining an appropriate "lodestar" figure, a court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate.  *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The court "may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (citing *Reed v. Rhodes*, 179 F.3d 453, 471-72 (6th Cir. 1999)).  In assessing the reasonableness of a fee award, courts

> [o]ften, but by no means invariably, . . . address these factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides."

*Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)

(quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).

*See also Ramey*, 508 F.2d at 1196.

Plaintiff's counsel submits that the Kessler Topaz firm billed 249.60 hours in connection with the litigation as of June 3, 2016; the law firm of Friedman Oster & Tejtel PLLC ("Friedman Oster") billed 68.5 hours in connection with the litigation as of June 3, 2016; and the law firm of Isaac, Wiles, Burkholder & Teetor, LLC ("Isaac Wiles") billed 11.10 hours in connection with the litigation as of March 25, 2016. *First Winchester Declaration*, ¶¶ 46-48; Exhibits 1 and 2, attached to *Supplemental Declaration of Robin Winchester*, ECF No. 27-1 ("*Supplemental Winchester Declaration*); *First Friedman Declaration*, ¶¶ 4-6; Exhibits 1 and 2, attached to *Supplemental Declaration of Jeremy Friedman*, ECF No. 27-2 ("*Supplemental Friedman Declaration*"); *First Landes Declaration*, ¶¶ 4-6; Exhibits 1 and 2, attached to *Supplemental Declaration of Mark Landes*, ECF No. 27-3 ("*Supplemental Landes Declaration*").  Based on the customary or current hourly rates charged by each firm, Class Counsel represents that the total lodestar value for the time is $155,951. *First Winchester Declaration*, ¶¶ 47, 59 (averring that the lodestar value for Kessler Topaz time billed is $112,216.25 and that the total lodestar value for all firm time combined is $155,951); *First Friedman Declaration*, ¶ 5 (averring that the lodestar value for Friedman Oster time billed is $39,850); *First Landes Declaration*, ¶ 4 (averring that the lodestar value for Isaac Wiles time billed is $3,885.75).  Class Counsel also submits that Kessler Topaz incurred a total of $3,259.08 in unreimbursed expenses

in connection with filing fees; messenger, courier, and overnight mailing fees; external reproduction costs; research; and internal reproduction costs. *First Winchester Declaration*, ¶ 57.

Plaintiff supports his fee request with evidence of the hours expended and hourly rates for each individual who worked on this matter as well as evidence of the experience of certain such individuals, as follows:

| Attorneys | | | | | |
|---|---|---|---|---|---|
| **Name** | **Title - Firm** | **Years of Experience** | **Hours** | **Hourly Rate** | **Total** |
| Marc A. Topaz | Partner – Kessler Topaz | Unknown | 3.35 | $850 | $2,847.50 |
| Robin Winchester | Partner – Kessler Topaz | Unknown | 36.50 | $725 | $26,462.50 |
| Eric Zagar | Partner – Kessler Topaz | Unknown | 5.50 | $800 | $4,400 |
| Seamus Kaskela | Associate – Kessler Topaz | Unknown | 20 | $500 | $10,000 |
| Christopher Windover | Associate – Kessler Topaz | Unknown | 104.25 | $425 | $44,306.25 |
| David Uris[3] | Staff Attorney – Kessler Topaz | Unknown | 35.25 | $350 | $12,337.50 |
| Jeremy Friedman | Member – Friedman Oster | 9 years | 43.50 | $600 | $26,100 |
| Spencer Oster | Member – Friedman Oster | 13 years | 11.50 | $550 | $6,325 |
| David Tejtel | Member – Friedman Oster | 9 years | 13.50 | $550 | $7,425 |
| Mark Landes | Partner – Isaac Wiles | 31 years | .70 | $350 | $245 |
| Maribeth Meluch | Partner – Isaac Wiles | 25 years | 9.30 | $350 | $3,255 |

---

[3] Mr. Uris is no longer with Kessler Topaz. *First Winchester Declaration*, ¶ 50(f).

| Mark Troutman | Partner – Isaac Wiles | 10 years | 1.10 | $350 | $385 |
| | | Total: | 284.45 | | $144,088.75 |

| Non-Attorneys | | | | | |
|---|---|---|---|---|---|
| **Name** | **Title - Firm** | **Years of Experience** | **Hours** | **Hourly Rate** | **Total** |
| Fabiana Angrisano | Investigation Dep't – Kessler Topaz | Unknown | 7 | $300 | $2100 |
| Jamie Maginnis | Investigation Dep't – Kessler Topaz | Unknown | 6.50 | $300 | $1950 |
| Christopher McGinnis | Paralegal – Kessler Topaz | Unknown | 9 | $250 | $2250 |
| Doug Tewksbury | Paralegal – Kessler Topaz | Unknown | 22.25 | $250 | $5562.50 |
| | | Total: | 44.75 | | $11,862.50 |

*First Winchester Declaration*, ¶¶ 48, 51; Exhibit 5 (firm and attorney resumes), attached thereto; *Supplemental Winchester Declaration*, ¶¶ 5-7; Exhibits 1 and 2 (schedules of time expended in this litigation with privileged information redacted), attached thereto; *First Friedman Declaration*, ¶ 6; Exhibit A (firm and attorney resumes), attached thereto; *Supplemental Friedman Declaration*, ¶¶ 5-7; Exhibits 1 and 2 (schedules of time expended in this litigation with privileged information redacted), attached thereto; *First Landes Declaration*, ¶¶ 3-4; *Supplemental Landes Declaration*, ¶¶ 5-7; Exhibits 1 and 2, (schedules of time expended in this litigation with privileged information redacted), attached thereto.

As noted *supra*, the lodestar figure is calculated by multiplying the proven number of hours reasonably expended on the litigation by a

reasonable hourly rate.  *See Grandview Raceway*, 46 F.3d at 1401.  The Court shall address in turn the number of hours reasonably expended and the reasonable hourly rate.

### A.    Hours Reasonably Expended

> [T]he key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation. . . . Although counsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified.

*Gascho v. Glob. Fitness Holdings*, LLC, 822 F.3d 269, 281 (6th Cir. 2016) (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008)) (internal quotation marks and citations omitted).

The Court concludes that the number of hours expended on this litigation is reasonable.  As noted *supra*, Class Counsel submitted schedules of the time expended in connection with this litigation. These records reflect that Friedman Oster counsel began researching and investigating the claims asserted in this action in June and July 2015 before this action was filed on September 24, 2015.  *See* Exhibit 1, attached to *Supplemental Friedman Declaration*.  While this firm continued to investigate and began drafting the *Complaint*, Kessler Topaz counsel and staff initiated their own investigation of ANF's Board of Directors in early August 2015 and assisted in fact-checking and revising the *Complaint*.  *Id.*; Exhibit 1, attached to *Supplemental Winchester Declaration*.  Counsel with Isaac Wiles provided reasonable assistance as local counsel in connection with the filing of the *Complaint*.  Exhibit 1, attached to *Supplemental Landes Declaration*. The records provided to the Court also reflect that counsel from all

firms assisted in communicating with defense counsel regarding a potential settlement and/or preparing settlement documents. *See* Exhibit 1, attached to *Supplemental Friedman Declaration*; Exhibit 1, attached to *Supplemental Friedman Declaration*; Exhibit 1, attached to *Supplemental Landes Declaration*. Counsel also reasonably expended hours in preparing the preliminary and final request for approval of settlement as well as communicating with the Court regarding the fairness hearing. *Id*. Moreover, the complexity of the case and the results ultimately achieved support the conclusion that the number of hours expended in this matter was reasonable. In short, this Court is satisfied that the number of hours billed by plaintiff's counsel is reasonable.

**B. Reasonable Hourly Rate**

The Court now turns to the reasonableness of plaintiff's counsel's hourly rates. "A trial court, in calculating the 'reasonable hourly rate' component of the lodestar computation, should initially assess the '*prevailing market rate in the relevant community.'*" *Adcock-Ladd*, 227 F.3d at 350 (emphasis in original) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). "The prevailing market rate is 'that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013) (quoting *Adcock-Ladd*, 227 F.3d at 350). *See also Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, No. 10-3643, 436 F. App'x 496, at *499 (6th Cir. Aug. 26, 2011) (quoting *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 618 (6th Cir. 2007)); *Geier v. Sundquist*, 372

F.3d 784, 791 (6th Cir. 2004); *Brian A. v. Hattaway*, No. 02-5666, 83 F. App'x 692, at *694 (6th Cir. Nov. 21, 2003). "The appropriate rate, therefore, is not necessarily the exact value sought by a particular firm, but is rather the market rate in the venue sufficient to encourage competent representation." *Gonter*, 510 F.3d at 618 (citing *Lamar Adver. Co. v. Charter Twp. of Van Buren*, 178 F. App'x 498 (6th Cir. 2006)). "A court may, however, award a higher hourly rate for an out-of-town specialist if (1) hiring the out-of-town specialist was reasonable in the first instance, and (2) if the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Brian A.*, 83 F. App'x at *694 (citing *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995)).

The Court shall address each firm's hourly rates in turn.

### 1. Hourly rates for Isaac Wiles

Isaac Wiles counsel's rates are $350 per hour. *First Landes Declaration*, ¶ 4. These rates "are in the range of its [the firm's] usual and customary hourly rates charged for this kind of work." *Id.* at ¶ 8. These rates are consistent with those in the local market and the Court's experience. *See, e.g., In re Sulzer Orthopedics, Inc.*, 398 F.3d 778 (6th Cir. 2005); *Gascho v. Glob. Fitness Holdings, LLC*, No. 2:11-CV-436, 2014 WL 1350509, at *34 (S.D. Ohio July 16, 2014) (recommending an attorneys' fee award in class action based on rates ranging from $180 per hour to $450 per hour), *adopted by*, 2014 WL 3543819, *aff'd*, 822 F.3d 269 (6th Cir. 2016); *Johnson v. Midwest Logistics Sys., Ltd.*, No. 2:11-cv-1061, 2013 WL 2295880 (S.D. Ohio May

24, 2013); *Lowther v. AK Steel Corp.*, No. 1:11-cv-877, 2012 WL 6676131 (S.D. Ohio Dec. 21, 2012).  The Court therefore finds that the hourly rate of $350 for work performed by Isaac Wiles counsel is reasonable.

### 2.    Hourly rates for Friedman Oster

Friedman Oster counsel's rates range from $550 to $600 per hour, which reflect the firm's "customary hourly rates." *First Friedman Declaration*, ¶¶ 6, 10.  These rates exceed the average hourly rates charged in Columbus, Ohio. *See supra*.  However, this Court concludes that it was reasonable for plaintiff to hire counsel from outside this forum.  ANF is a corporation with an international presence, plaintiff is a shareholder from Florida, and the issues in this case are complex and not limited to those peculiar to this District.  It is also significant that, in additional to their local counsel, both plaintiff and defendants are represented in this action by national counsel with substantial experience in securities litigation.  Given Class counsel's skill, experience, and reputation, and considering the specialized issues presented in this case, it was reasonable for Plaintiff to hire out of district specialists.  After reviewing the record, the Court concludes that the hourly rates requested by Friedman Oster counsel are reasonable.

As noted *supra*, the requested billing rates reflect Friedman Oster's customary hourly rates. Moreover, the firm undertook this litigation on an entirely contingent basis. *First Friedman Declaration*, ¶¶ 3, 10.  The rates reflect Friedman Oster's highly specialized skill and experience, and reputation in shareholder litigation. *Id.* at ¶ 11. Friedman Oster is "a New York based

litigation boutique that specializes in shareholder rights and corporate governance litigation." Exhibit 1, p. 1, attached to *First Friedman Declaration*.  Friedman Oster actively litigates shareholder derivative and class action litigation in the Delaware Court of Chancery, which is nationally recognized for its expertise in corporate and shareholder litigation.  *Id.* at 1-2; *First Friedman Declaration*, ¶¶ 8, 14.  In other litigation, the firm has obtained significant results for corporate stockholders.  Exhibit 1, p. 1, attached to *First Friedman Declaration* (detailing favorable litigation results).  Attorney Jeremy Friedman, Spencer Oster, and David Tejtel, are experienced in shareholder class actions, corporate governance, and transactional litigation, with a combined experience of over thirty years.  *Id.* at 3-4.

The hourly rates charged by Friedman Oster are consistent with the rates for similar services by lawyers of reasonably comparable skill, experience, and national reputation.  Notably, Plaintiff presents evidence that suggests that Friedman Oster's hourly rates are commensurate with those of counsel for certain defendants who, like Plaintiff's counsel, have extensive experience and national reputations in the areas of shareholder derivative and class action litigation.  *See*, *e.g.*, *First Winchester Declaration*, ¶ 54 (citing findings by the National Law Journal ("NLJ"), "Billing Rates Across the Country," Jan. 13, 2014, *available at* http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country?slreturn=20160704124207); Exhibit 6,, PAGEID#:905, attached thereto (excerpts from "Billing Rates Across the Country,"

reporting partner billing rates between $495 and $875 for the law firm
of Alston & Bird LLP, counsel for Wells Fargo), PAGEID#:906-907
(reporting partner billing rates between $490 and $780 for the law
firm of Patton Boggs, and partner billing rates between $350 and $950
for the law firm Squire Sanders, which merged into the law firm Squire
Patton Boggs, LLP, counsel for Individual Defendants).

   In arguing that Plaintiff's counsel's hourly rates are
reasonable, Plaintiff asks this Court to consider that it has
previously approved higher hourly rates charged by counsel with
similar specialized skill. *First Winchester Declaration*, ¶¶ 53, 55
(citing *In re Porsche Cars North America, Inc. Plastic Coolant Tubes
Products Liability*, S.D. Ohio Case No. 2:11-md-2233, which approved
fee award based on hourly rates of up to $850 for partners); Exhibits
7 and 8, attached thereto (copies of motion for attorneys' fees and
order granting such request filed in *In re Porsche Cars North America,
Inc. Plastic Coolant Tubes Products Liability*, S.D. Ohio Case No.
2:11-md-2233); *First Friedman Declaration*, ¶ 13.  While *In re Porsche
Cars North America, Inc. Plastic Coolant Tubes Products Liability* was
a multi-district litigation involving products liability and this
action is not, the Court nevertheless notes that Friedman Oster's
hourly rates are lower than those previously approved by this Court in
other litigation.

   Finally, Plaintiff presents evidence of the reasonableness of
Friedman Oster's hourly rate in light of those approved by the
Delaware Court of Chancery, which "has a national recognition for its
expertise in corporate and shareholder litigation." *First Friedman

*Declaration*, ¶ 14.  The Delaware Court of Chancery has traditionally "used hours worked to calculate an effective hourly rate that can be examined to guard against windfall compensation when awarding large fees." *In re Sauer-Danfoss Inc. Shareholders Litig.*, 65 A.3d 1116, 1139 (Del. Ch. 2011).  This "implied hourly rate" for Friedman Oster is $581.75 (dividing the Friedman Oster lodestar of $39,850 by 68.50 Friedman Oster hours billed), which is within the range approved by the Delaware Court of Chancery.  *First Friedman Declaration*, ¶¶ 6, 14.

For all these reasons, the Court concludes that the hourly rates ranging from $550 per hour to $600 per hour for work performed by Friedman Oster's counsel is reasonable.

### 3. Hourly rates for Kessler Topaz

Kessler Topaz counsel's billing rates range from $350 per hour to $850 per hour, reflecting the customary billing rates for partners, associates, and a staff attorney.  *First Winchester Declaration*, ¶ 48, 52.  As noted *supra*, these rates exceed the average hourly rates charged in Columbus, Ohio but, for the reasons previously discussed, it was reasonable for Plaintiff to hire counsel from outside this forum.  For the reasons that follow, the Court concludes that the hourly rates for counsel at Kessler Topaz are reasonable, but the hourly rates for the firm's non-attorneys are not reasonable.

Kessler Topaz is a large and successful shareholder litigation firm with offices in Pennsylvania and California, recognized by the National Law Journal as one of the top securities class action law firms in the United States.  *First Winchester Declaration*, ¶¶ 51, 53; Exhibit 5, p. 1, attached thereto (copy of firm resume).  Kessler

Topaz has served as lead or co-lead counsel in many large and complex class actions involving high-profile clients. Exhibit 5, pp. 1-15, attached to *First Winchester Declaration* (highlighting noteworthy litigation). Kessler Topaz undertook this litigation on an entirely contingent basis. *First Friedman Declaration*, ¶ 38.

The hourly rates charged by Kessler Topaz are consistent with the rates for similar services by lawyers of reasonably comparable skill, experience, and national reputation. As discussed above, the hourly rates reflected in the NLJ survey suggest that Kessler Topaz counsel's hourly rates are commensurate with those of counsel for some of the defendants, who also likewise possess extensive expertise with national reputations in the areas of shareholder derivative and class action litigation. *First Winchester Declaration*, ¶ 54; Exhibit 6, attached thereto #:905, attached thereto (reporting partner billing rates between $495 and $875 for the law firm of Alston & Bird LLP, counsel for Wells Fargo), PAGEID#:906-907 (reporting partner billing rates between $490 and $780 and associate billing rates between $325 and $475 for the law firm of Patton Boggs, and partner billing rates between $350 and $950 as well as associate billing rates between $250 and $530 for the law firm Squire Sanders).

Although at the high end, the Kessler Topaz partners' hourly rates are within the range of or are comparable to those rates previously approved by this Court. *First Winchester Declaration*, ¶¶ 53, 55 (citing *In re Porsche Cars North America, Inc. Plastic Coolant Tubes Products Liability*, S.D. Ohio Case No. 2:11-md-2233, which

approved fee award based on hourly rates of up to $850 for partners and $550 for associates for out-of-district counsel).

Plaintiff also points out that Kessler Topaz's "implied hourly rate" of $449.58 (dividing Kessler Topaz lodestar of $112,216.25 by 249.60 Kessler Topaz hours billed) is consistent with rates approved by the Delaware Court of Chancery. *First Winchester Declaration*, ¶¶ 48, 56 (citing *Seinfeld v. Coker*, 847 A.2d 330, 337-38 (Del. Ch. 2000) (approving rate of $1300 per hour); *In re KSW, Inc. S'holder Litig.*, No. 7875-VCG, copy of transcript attached thereto as Exhibit 9, PAGEID#:1153 (noting that rate of $762 per hour "is a healthy rate but not unusual or excessive particularly in light of the fact that this was a purely contingent fee case"); *Pontiac Gen. Emps. Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, copy of transcript attached thereto as Exhibit 11).

The hourly rates for Kessler Topaz partners, associates, and staff attorneys - which range from $350 to $850 - is therefore reasonable based on the present record.

Plaintiff also seeks fees for non-attorneys employed by Kessler Topaz.  Plaintiff specifically seeks $250 per hour for work performed by two paralegals. *First Winchester Declaration*, ¶ 48.  Plaintiff submits that the paralegals belong to Kessler Topaz's Acquisitions and Shareholder Derivative Litigation Group.[4]  *Id.* at ¶ 50(g), (h).  The paralegals' work involved proofreading and cite-checking as well as monitoring the docket and noting upcoming deadlines. *Id*.  The Court, however, finds that this requested rate is double the hourly rates

---

[4] One of the paralegals, Doug Tewksbury, is no longer employed by Kessler Topaz.  *Id.* at ¶ 50(g).

recently approved for paralegals by this Court.  *See Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, No. 2:10-cv-00789, 2014 WL 5034643, at *8 (S.D. Ohio Oct. 8, 2014) ($125 per hour for paralegals); *Castro v. Los Camperos, Inc.*, No. 2:13-cv-1186, 2014 WL 4626292, at *4 (S.D. Ohio Sept. 15, 2014) ("Considering that only 10.3 percent of paralegals in the greater Columbus area bill at a rate over $130 per hour, *see The Economics of Law Practice in Ohio in 2013,* p. 43, . . . ."); *Javery v. Lucent Techs. Inc. Long-Term Disability Plan for Mgmt. or LBA Emps.*, No. 2:09-cv-00008, 2014 WL 2779427, at *8 (S.D. Ohio June 19, 2014) ($125 per hour for paralegals); *Wilson v. D & N Masonry, Inc.*, No. 1:12-cv-922, 2014 WL 1789136, at *2 (S.D. Ohio May 5, 2014) ($125 per hour for paralegals).  Indeed, this Court has recently concluded in a previous action involving ANF that a rate for paralegals should be limited to $125 per hour.  *See City of Plantation Police Officers' Employees' Ret. Sys. v. Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *15 (S.D. Ohio Dec. 30, 2014).  The Court is not persuaded that this conclusion was incorrect.  The Court therefore limits Kessler Topaz's paralegals' hourly rate to $125.

Plaintiff also seeks fees for work performed by two individuals in Kessler Topaz's "Investigation Department." *First Winchester Declaration*, ¶ 48.  These individuals' rates are $300 per hour for "identifying addresses for the Individual Defendants in order to effectuate service of process of the complaint." *Id*. at 50(i)(j).  There is no evidence of these individuals' experience. *See id.*  While the Court recognizes the need to effect proper service of process, it is not persuaded that the present record justifies an hourly rate of

$300, which is comparable to the $350 hourly rate charged by Kessler Topaz's staff attorney.  *Id.* at ¶ 48.  The Court will therefore limit the hourly rate for these individuals in Kessler Topaz's "Investigation Department" to the amount permissible for paralegals, *i.e.,* $125 per hour.

Considering the foregoing, the Court calculates Plaintiff's counsel's lodestar value at $149,682.50:

| Name | Title - Firm | Years of Experience | Hours | Hourly Rate | Total |
|------|-------------|--------------------|-------|-------------|-------|
| Marc A. Topaz | Partner – Kessler Topaz | Unknown | 3.35 | $850 | $2,847.50 |
| Robin Winchester | Partner – Kessler Topaz | Unknown | 36.50 | $725 | $26,462.50 |
| Eric Zagar | Partner – Kessler Topaz | Unknown | 5.50 | $800 | $4,400 |
| Seamus Kaskela | Associate – Kessler Topaz | Unknown | 20 | $500 | $10,000 |
| Christopher Windover | Associate – Kessler Topaz | Unknown | 104.25 | $425 | $44,306.25 |
| David Uris | Staff Attorney – Kessler Topaz | Unknown | 35.25 | $350 | $12,337.50 |
| Jeremy Friedman | Member – Friedman Oster | 9 years | 43.50 | $600 | $26,100 |
| Spencer Oster | Member – Friedman Oster | 13 years | 11.50 | $550 | $6,325 |
| David Tejtel | Member – Friedman Oster | 9 years | 13.50 | $550 | $7,425 |
| Mark Landes | Partner – Isaac Wiles | 31 years | .70 | $350 | $245 |
| Maribeth Meluch | Partner – Isaac Wiles | 25 years | 9.30 | $350 | $3,255 |
| Mark Troutman | Partner – Isaac Wiles | 10 years | 1.10 | $350 | $385 |
| Fabiana Angrisano | Investigation Dep't – Kessler Topaz | Unknown | 7 | $125 | $875 |

| Jamie Maginnis | Investigation Dep't – Kessler Topaz | Unknown | 6.50 | $125 | $812.50 |
|---|---|---|---|---|---|
| Christopher McGinnis | Paralegal – Kessler Topaz | Unknown | 9 | $125 | $1125 |
| Doug Tewksbury | Paralegal – Kessler Topaz | Unknown | 22.25 | $125 | $2781.25 |
| | | **Total:** | **329.20** | | **$149,682.50** |

As discussed *supra*, the Court may, "within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd*, 227 F.3d at 349 (quoting *Reed,* 179 F.3d at 471-72). In adjusting the lodestar to arrive at a reasonable fee award, a court may consider the following factors:

> "(1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."

*Id*. at 349 n.8 (quoting *Reed,* 179 F.3d at 471-72 n. 3). Of these factors, the "results obtained" is most important factor in determining the reasonableness of a fee award. *Kentucky Rest. Concepts Inc. v. City of Louisville*, 117 F. App'x 415, 420 (6th Cir. 2004) (citing *Hensley*, 461 U.S. at 434-36). *See also Adcock-Ladd*, 227 F.3d at 349 ("A highly important *Johnson* factor is the *result achieved.*") (emphasis in original).

As previously discussed, the proposed settlement provides a substantial benefit to ANF and its shareholders. More briefly, the proposed settlement resulted in the Amendments to the Credit

Agreements, which removed threats posed by the Dead Hand Proxy Put and Poison Put provisions.  The proposed settlement also effectuated corporate governance reform aimed at preventing the ANF Board from improperly agreeing to similar debt acceleration provisions in future agreements.  The proposed settlement specifically addresses the alleged misconduct in the *Complaint* and provides immediate relief without the expense associated with years of litigation.

As noted *supra*, stockholder class action litigation is inherently complex and the prosecution of such actions typically requires specialized skill.  Plaintiff's counsel also undertook the litigation on a contingent fee basis and devoted substantial time and energy to the action despite the risk associated with such fee arrangements. Indeed, the risk presented in this litigation was significant: Plaintiff's counsel devoted nearly 300 hours in connection with the litigation without any guarantee of compensation.  There is a substantial public interest in compensating counsel at a rate that takes into account not only the work performed but also the risk of undertaking representation on a contingent basis.  It is also significant that Plaintiff's counsel has not sought fees for work performed after June 3, 2016, including time attending the fairness hearing.  Moreover, it is worth noting that, although potentially thousands of stockholders were informed of the potential for an award of attorneys' fees and costs, and of the amount of fees and costs sought, *Notice*, ECF No. 18-3; *Affidavit of Mailing*, ¶ 2, there were no objections filed.

Plaintiff seeks $165,000 in attorneys' fees, which he represents is based upon multiplier of 1.06.  *Plaintiff's Motion for Final Approval*, PAGEID#:742 (citing *First Winchester Declaration*, ¶¶ 59-60).[5] After reductions in the lodestar value as calculated *supra*, *i.e.*, 149,682.50, a $165,000 award would yield a multiplier of 1.10.  This multiplier falls within the range of those previously approved by this Court, *see Jeffries*, No. 2:14-CV-1380, 2014 WL 7404000, at *19, and below the range of those approved in other corporate governance cases and shareholder litigation.  *See*, *e.g.*, *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ("In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation.") (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052-54 (9th Cir. 2002) (listing 23 settlements and multipliers for each, in which the average multiplier is 3.28)). Considering the benefits of the proposed settlement, the risk undertaken by Plaintiff's counsel, the skill of counsel for both sides, society's stake in rewarding attorneys for the benefits secured, and the complexity and duration of the litigation, all discussed *supra*, the Court finds that a lodestar multiplier of 1.10 is appropriate in this case.  Accordingly, the Court concludes that Plaintiff is entitled to an award of reasonable attorneys' fees in the

---

[5] Plaintiff represents that he subtracted expenses in arriving at this multiplier, *see id.*, but it appears from the Court's calculation that Plaintiff did not, in fact, subtract expenses when reaching a multiplier of 1.06.

amount of $165,000.  Additionally, the Court finds that Plaintiff is entitled to expenses in the amount of $2,000.[6]

**WHEREUPON**, based on the foregoing, the Court concludes that Plaintiff and the Class have met their burden of showing that the prerequisites for the certification of a class action pursuant to Rule 23(a) and Rule 23(b)(1)(A) and (b)(2) have been satisfied in this case, that the *Stipulation and Agreement of Settlement* is fair, reasonable, and adequate, and that Class Counsel's requested award of fees and expenses is fair and reasonable.  Accordingly, it is hereby

**RECOMMENDED** that

> (a) because the proposed settlement of the action on the terms and conditions set forth in the *Stipulation and Settlement Agreement* is fair, reasonable, adequate, and in the best interest of the Class, the *Settlement Agreement* be finally approved by the Court;
>
> (b) the Class be finally certified for settlement purposes;
>
> (c) the Action be dismissed with prejudice pursuant to the terms of the *Stipulation and Settlement Agreement*;
>
> (d) the Class, Class Plaintiff Representative, and defendants be bound by the release set forth in the *Stipulation and Settlement Agreement*; and
>
> (e) Class Counsel be awarded reasonable attorneys' fees in the amount of $165,000 and reimbursement of expenses in the amount of $2,000.

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part

---

[6] Plaintiff submitted evidence of expenses totaling $3,259.08, *see First Winchester Declaration*, ¶¶ 57-58, but as noted *supra*, the proposed settlement limits Plaintiff's recovery of expenses to $2,000.  *Stipulation and Settlement Agreement*, ¶ 21.

thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


August 5, 2016                         <u>   *s/Norah McCann King*   </u>
                                       Norah M<sup>c</sup>Cann King
                                       United States Magistrate Judge